IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ASHLEY D. K.,                          )
                                       )
                 Plaintiff,            )
                                       )
       v.                              )       1:23CV1037
                                       )
LELAND DUDEK,                          )
Acting Commissioner of Social Security,)
                                       )
                 Defendant.            )

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Ashley D. K. ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.    PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on September 1, 2020, alleging a disability onset date of February 21, 2016. (Tr. at 25, 152-53.)[1] Plaintiff's application was denied initially (Tr. at 66-71, 80-84) and upon reconsideration (Tr. at 72-77, 90-94). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 96-97.) On March 2, 2022, Plaintiff, along with his non-attorney

---

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #5].

representative, attended the subsequent telephonic hearing, at which Plaintiff and an impartial vocational expert testified. (Tr. at 25, 44-65.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 39), and on October 11, 2023, the Appeals Counsel denied Plaintiff's request for review of that decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

II.  LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

2

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.³ Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that

---

³ "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

4

a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, Plaintiff filed his DIB applications on September 1, 2020, but his "Date Last Insured" for purposes of DIB was December 31, 2019. Therefore, Plaintiff was required to establish that he became disabled prior to that date. At the first step of the analysis, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" between his alleged onset date, February 21, 2016, and his Date Last Insured, December 31, 2019. (Tr. at 28.) The ALJ therefore concluded that Plaintiff met his burden at step one of the sequential evaluation process. (Tr. at 27-28.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> left femur fracture status post open reduction internal fixation (ORIF), left hip fracture status post (ORIF) [sic], lumbar spondylosis, bilateral knee degenerative joint disease, seizure disorder, hepatitis B, traumatic brain injury, anxiety[,] depression, [and] obesity[.]

(Tr. at 28.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 28-31.) Therefore, the ALJ assessed Plaintiff's RFC and determined that he could perform a range of sedentary work with the following, additional limitations:

> [Plaintiff can] lift and carry 10 pounds occasionally and less than 10 pounds frequently; stand and walk up to two hours in an eight hour day; sit up to six hours in an eight hour day; occasionally push or pull with the left lower extremity; never climb ladders, ropes, or scaffolds; [and] occasionally kneel, crouch, or crawl. [Plaintiff] must avoid working at unprotected heights and around dangerous machinery and is limited to performing unskilled work consisting of routine tasks. [He] can maintain concentration, persistence, and pace for two hour periods during the day.

(Tr. at 31.) At step four of the analysis, the ALJ found, based on the vocational expert's testimony, that all of Plaintiff's past relevant work exceeded his RFC. (Tr. at 37.) However, the ALJ further determined at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, he could perform other jobs available in significant numbers in the national economy. (Tr. at 37-38.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 38-39.)

Plaintiff now raises two challenges to the ALJ's decision. First, he contends that the ALJ failed to account for the "somewhat" persuasive opinion of the consultative examiner, Family Nurse Practitioner Angela Lamb, when crafting Plaintiff's RFC assessment. (Pl.'s Br. [Doc. #8] at 1.) Second, Plaintiff argues that the ALJ failed to resolve apparent conflicts between the vocational expert's ("VE") testimony and the job descriptions provided in the Dictionary of Occupational Titles ("DOT"). (Pl.'s Br. at 1.) After a thorough review of the record, the Court finds that neither of these contentions requires remand.

A. Nurse Practitioner Lamb's Opinion

Plaintiff first argues that the ALJ failed to properly account for the opinion of Family Nurse Practitioner Lamb when assessing Plaintiff's RFC. In pertinent part, Nurse Lamb, who performed a consultative examination of Plaintiff on June 3, 2022, opined that Plaintiff required an assistive device and had "[s]evere limitations in sitting, standing, [and] walking."

(Tr. at 36.) Despite finding Nurse Lamb's opinion "somewhat" persuasive, the ALJ ultimately determined that Plaintiff could stand and walk for up to two hours in the course of an eight-hour workday and could sit for up to six hours. (Tr. at 31.)

Under the applicable regulations for claims filed on or after March 27, 2017,

> [The ALJ] will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources. When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. . . .
>
> (1) <u>Supportability.</u> The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) <u>Consistency.</u> The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.
>
> (3) <u>Relationship with the claimant</u> . . . [which includes]: (i) Length of the treatment relationship. . . (ii) Frequency of examinations. . . . (iii) Purpose of the treatment relationship. . . . (iv) Extent of the treatment relationship. . . [and] (v) Examining relationship. . . .
>
> (4) <u>Specialization.</u> The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.
>
> (5) <u>Other factors.</u> . . . This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements. . . .

20 C.F.R. § 404.1520c(a) and (c) (emphasis added). The regulations also require decision-makers to "articulate in . . . [their] decision[s] how persuasive [they] find all of the medical opinions . . . in [a claimant's] case record." 20 C.F.R. § 404.1520c(b). Although all of the factors listed in paragraphs (c)(1) through (c)(5) of § 404.1520c should be considered in making this determination, the regulations specifically provide that the most important factors when evaluating the persuasiveness of an opinion are the first two: supportability and consistency. 20 C.F.R. §§ 404.1520c(a), (c)(1)–(c)(2). Therefore, paragraph (b) further provides that ALJs "will explain how [they] considered the supportability and consistency factors for a medical source's medical opinions . . . in [the] determination or decision." 20 C.F.R. § 404.1520c(b)(2). Express discussion of the remaining factors is not required. See 20 C.F.R. § 404.1520c(b)(3); see also Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 5853 (Jan. 18, 2017) (explaining that the final rules in § 404.1520c "require our [ALJs] to consider all of the factors" in § 404.1520c(c) "for all medical opinions and, at a minimum, to articulate how they considered the supportability and consistency factors" in determining persuasiveness). In other words, §§ 404.1520c(b)–(c) define the "minimum level of articulation" an ALJ must include in her written decision "to provide sufficient rationale for a reviewing . . . court." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. at 5858; see also Keene v. Berryhill, 732 F. App'x 174, 177 (4th Cir. 2018).

Here, as set out in the administrative decision, the ALJ found Nurse Lamb's opinion "somewhat" persuasive "to the extent [it is] consistent with the objective medical evidence from the alleged onset date through the date last insured," i.e., from February 21, 2016 through

8

December 31, 2019. (Tr. at 36.) However, the ALJ further noted that Nurse Lamb's opinion "was rendered over two [years] after the date last insured." (Tr. at 36.) Although Plaintiff's back and left leg impairments persisted during this later period and therefore remained relevant, the ALJ found that Nurse Lamb's further opinions regarding "impairments . . . not present before [the] date last insured" were not persuasive. (Tr. at 36.) Nevertheless, the ALJ specifically acknowledged Nurse Lamb's findings that Plaintiff "still has continued impairment of the back and left leg even after the date last insured" as one basis for finding Plaintiff more limited than opined by the State agency medical consultants, who posited that Plaintiff could perform light work. (Tr. at 36 (further noting that "evidence received at the hearing level," including Nurse Lamb's examination and opinion, "supports a greater degree of physical and mental limitation").) In fact, the ALJ cited Nurse Lamb's findings when finding the State agency consultants' opinions "not persuasive." (Tr. at 36.) Thus, the ALJ's discussion of Nurse Lamb's opinion addresses both consistency and supportability, and the ALJ met her obligation under the Act.

Plaintiff nevertheless contends that the ALJ failed to sufficiently explain why she did not account for Nurse Lamb's findings of "severe" limitations in sitting, standing, and walking due to pain, and Nurse Lamb's findings of the need for a cane or assistive device. However, the ALJ did address these issues, and specifically found that Plaintiff's "ability to sit, stand, walk, stoop, kneel, crouch and crawl <u>are significantly limited</u>" as a result of "bilateral knee pain and lumber spine pain." (Tr. at 32 (emphasis added).) The ALJ then discussed at length the extent of the limitations and the effect on the RFC. As part of the discussion, the ALJ found that Plaintiff "does not require the use of a handheld device for ambulation." (Tr. at 29-30.)

9

The ALJ discussed Plaintiff's initial injury from a car accident in February 2016 that resulted in significant injuries, including significant injuries to his left leg and back requiring extensive surgeries, with inpatient and/or intensive rehabilitation and physical therapy from March through June 2016.[4] (Tr. at 33, 311-1253.) That intensive rehabilitation and physical therapy included use of a wheelchair, walker, and cane. However, as specifically noted by the ALJ, at a follow-up appointment in May 2016, Plaintiff was in "no acute distress with normal range of motion and strength of the spine" and with normal neurological exam. (Tr. at 33-34 (citing Tr. at 297, 301, 304).) The records from that May 2016 visit reflect that Plaintiff was complaining of head pain and foot pain, but had been there 10 days earlier and left Against Medical Advice after they told him they would not give him pain medication. (Tr. at 300-01.) The May 2016 evaluation notes reflect normal range of motion and "normal motor" (Tr. at 304), foot pain due to cellulitis with an unremarkable x-ray (Tr. at 297), and no numbness or weakness in extremities (Tr. at 301), with no indication of any cane or other assistive device.[5]

---

[4] Plaintiff's medical records from the day of the accident reveal positive test results for cocaine and marijuana, and in one of Plaintiff's consultative exams, he reported a history of illicit drug use including marijuana, cocaine, and heroin, noting that he believes his drug use caused the accident, although he cannot remember that day. (Tr. at 278, 290, 322, 543, 1962.) Plaintiff's additional medical records similarly indicate a history of substance abuse. (See, e.g., Tr. at 1123, 1369, 1432-81.) The ALJ "recognize[d] that substance abuse is an issue in [Plaintiff's] medical history" but found that it was "not a material factor to the conclusion," and concluded that the "evidence does not establish significant limitation of work-related function secondary to" Plaintiff's substance abuse. (Tr. at 28.)

[5] The ALJ also noted a hospital visit shortly thereafter in July 2016, where Plaintiff raised complaints regarding seizures. (Tr. at 34 (citing Tr. at 1254-73).) That evaluation similarly reflects normal range of motion of extremities and normal motor, with no indication of the need for an assistive device. (Tr. at 1262-63, 1266.) Plaintiff's follow-up appointment in August 2016 likewise reflects normal range of motion, normal gait, "a normal station and narrow-based, steady gait; Able to perform tandem gait, toes-only and heels-only without difficulty," with no indication of a cane or a need for an assistive device. (Tr. at 1317.) The ALJ separately addressed the issue of Plaintiff's seizures (Tr. at 34), and Plaintiff does not raise any challenges to the ALJ's findings on that issue.

As noted by the ALJ, the record includes no treatment notes from mid-2016 until mid-2019, when Plaintiff sought treatment for Bell's Palsy and knee pain while he was in prison.[6] (Tr. at 34.) The record reflects that Plaintiff went to the emergency room in April 2019 for Bell's Palsy (Tr. at 1889), and that hospital record does not reflect any leg, back, or mobility complaints, and with notations of no ambulatory aids (Tr. at 1888) and ambulatory at departure in police custody. (Tr. at 1895, 1910.) As noted by the ALJ, Plaintiff sought treatment for knee pain in December 2019/January 2020 (Tr. at 34-35), and those records reflect that Plaintiff reported at a visit on December 28, 2019 that he had injured his <u>right</u> knee two weeks earlier, on December 14, 2019, and that he had limited mobility and gait changes during those two weeks. (Tr. at 1348.) An x-ray was ordered and reflected no acute abnormality and moderate degenerative changes. (Tr. at 35, 1370.)

Subsequent follow-up records, after the December 31, 2019 Date Last Insured, "reflect routine visits and medication management for complaints of chronic back and knee pain" with exam findings "normal overall." (Tr. at 35.) The record supports this finding. For example, records from January 2020 reflect that Plaintiff "ambulates well" with 5/5 strength and extension and flexion (Tr. at 1336). A hospital visit in July 2020 notes normal 5/5 strength, not a fall risk and no assistive devices, with a steady gait and ambulatory at departure. (Tr. at

---

[6] North Carolina Department of Corrections records reflect that Plaintiff was arrested in October 2016 on charges of Indecent Liberties with a Child and Statutory Rape, for an offense in September 2016. He was apparently in local custody for 3 years, until his conviction in October 2019 on the charge of Indecent Liberties, and he was transferred to the North Carolina Department of Corrections in December 2019, where he stayed until his release in May 2020. Between May 2020 and November 2023, he was in and out of custody for violations of his post-release supervision. The record in this case includes the medical records from the North Carolina Department of Adult Corrections and a hospital visit in April 2019 while still in local custody. At his admission screening to the North Carolina Department of Adult Corrections in December 2019, he had a full range of motion with no indication of any assistive devices or ambulation issues. (Tr. at 1357-66.)

1821-22, 1832, 1835, 1867, 1870.) A visit the next month in August 2020 notes normal movement of all extremities and normal gait, with no complaints of muscle weakness or joint pain and "ambulating normally." (Tr. at 1718-19.) An office visit and subsequent hospital visit for seizures the next month, in September 2020, likewise reflects exam findings of "5/5 strength throughout the upper and lower extremities and normal gait." (Tr. at 35, 1433-34, 1385, 1395-96.) Another hospital visit a year later, in November 2021, likewise noted normal objective findings with normal range of motion and normal gait (Tr. at 35, 1764), with no assistive device noted and ambulatory at departure. (Tr. at 1744, 1757, 1793.)

The ALJ then discussed Nurse Lamb's evaluation in June 2022, and noted that Plaintiff ambulated with a left sided limp (Tr. at 35), and the ALJ then further discussed Nurse Lamb's opinion that Plaintiff "has severe limitations in sitting, standing, and walking" due to pain (Tr. at 36). Upon exam, Plaintiff exhibited limited muscle strength in his left leg as compared to his right. He also exhibited left leg edema. (Tr. at 1951-52.) He "was able to rise from a sitting position with assistance and had no difficulty getting up and down from the exam table." (Tr. at 1953.) However, he had a limited range of motion in his left leg and back. (Tr. at 1954-56.) Based on her findings, Nurse Lamb opined that Plaintiff had "severe" limitations in walking, standing, and sitting due to "leg and back pain." (Tr. at 1956.) She further opined that Plaintiff required the use of a cane, which she characterized as "medically necessary" and prescribed by Plaintiff's physical therapist. (Tr. at 1957.) As noted above, the ALJ found Nurse Lamb's opinion somewhat persuasive "to the extent it is consistent with the objective medical evidence from the alleged onset date through the date last insured," but not persuasive "with regard to impairments and limitations due to impairments not present before the date

last insured." (Tr. at 36.)[7] The ALJ also noted Nurse Lamb's finding that Plaintiff "still has continued impairment of the back and left leg even after the date last insured" but found that "[n]evertheless [Plaintiff] is capable of a range of sedentary work, as outlined in the residual functional capacity." (Tr. at 36.) As noted above, the ALJ found that Plaintiff did not require the use of a handheld device for ambulation (Tr. at 29-30), and found that Plaintiff was capable of sedentary work as set out in the RFC "consistent with and supported by the observations of treating sources in the medical records." (Tr. at 37.) Substantial evidence in the record supports those findings, as set out in the ALJ's decision and summarized above. Consistent with Nurse Lamb's findings of severe limitations due to leg and back pain, the ALJ determined that Plaintiff's impairments required extensive limitations, including a limitation to sedentary work with a maximum of two hours of standing and walking per eight-hour workday and six hours of sitting per workday. (Tr. at 31.) Plaintiff fails to suggest what further limitations Nurse Lamb's opinions would support. To the extent that Plaintiff argues that Nurse Lamb's opinion supports Plaintiff's need for an assistive device, Plaintiff's use of a cane—even a medically necessary cane—in 2022 does not establish that a cane was medically necessary for ambulation on or before December 31, 2019. In fact, Plaintiff points to no evidence that he used a cane during the alleged disability period. As discussed above, in the time after the accident and during and just after Plaintiff's date last insured, but prior to his consultative

---

[7] As the ALJ correctly noted, this delay limited the relevance of Nurse Lamb's opinion, as more recent impairments and limitations impacted her examination findings. For example, only a month prior to his consultative examination, Plaintiff was in a moped accident in which he broke his scapula and four ribs. (Tr. at 1950, 1957, 1960.) The ALJ did not further address or discuss the subsequent impairments and limitations, as the focus was on Plaintiff's impairments and limitations prior to the December 31, 2019 Date Last Insured.

13

examination in 2022, the ALJ recounted that Plaintiff's exam findings noted 5/5 strength in the lower extremities and normal gait. (Tr. at 34-35)

In short, the ALJ clearly explained that she relied on Nurse Lamb's findings along with other evidence, including objective medical evidence and testimony, to find that Plaintiff remained capable of a limited range of sedentary work. Although Nurse Lamb did not define the extent to which "severe" limitations in walking, standing, and sitting would limit Plaintiff's ability to work, the ALJ nonetheless included greater RFC limitations in these areas than suggested anywhere else in the record. The ALJ discussed and explained his analysis of Nurse Lamb's evaluation, substantial evidence supports the ALJ's conclusions, and the Court finds no basis for remand.

B.  DOT Conflict

Plaintiff next contends that at step five of the sequential process, in evaluating whether sufficient other work exists in the national economy, the ALJ failed to identify and obtain a reasonable explanation for apparent conflicts between the testimony of the vocational expert ("VE") and the Dictionary of Occupational Titles ("DOT"). Specifically, Plaintiff contends that the Vocational Expert's testimony conflicted with the DOT, but that the ALJ failed to obtain a reasonable explanation for the conflict as required by Social Security 00-4p, Policy Interpretation Ruling: Titles II & XVI: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Information in Disability Decisions, 2000 WL 1898704 (Dec. 4, 2000) ("SSR 00-4p").[8] In Pearson v. Colvin, 810 F.3d 204 (4th Cir. 2015), the Fourth Circuit explained the ALJ's obligation at step five:

---

[8] SSR 00-4p provides that:

To answer this final question—whether sufficient other work exists for the claimant in the national economy—the ALJ "rel[ies] primarily" on the Dictionary. Soc. Sec. Admin., Policy Interpretation Ruling: Titles II & XVI: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions, Social Security Ruling (SSR) 00–4p, 2000 WL 1898704 (Dec. 4, 2000), at *2 (the Ruling). The ALJ "may also use" a vocational expert to address complex aspects of the employment determination, including the expert's observations of what a particular job requires in practice or the availability of given positions in the national economy. Id.

Because the expert's testimony can sometimes conflict with the Dictionary, the Social Security Administration has promulgated a multi-page, formal ruling to "clarif[y the] standards for the use of vocational experts" at ALJ hearings. Id. at *1. The Ruling requires that the ALJ "inquire, on the record, ... whether" the vocational expert's testimony "conflict[s]" with the Dictionary, and also requires that the ALJ "elicit a reasonable explanation for" and "resolve" conflicts between the expert's testimony and the Dictionary. Id. at *2. The ALJ must, by determining if the vocational expert's explanation is "reasonable," resolve conflicts "before relying on the [vocational expert's] evidence to support a determination or decision about whether the claimant is disabled." Id.

---

When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:
Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and
If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.
....
When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

Notably, SSR 00-4p was recently rescinded by Social Security Ruling 24-3p: Policy Interpretation Ruling: Titles II and XVI: Use of Occupational Information & Vocational Specialist & Vocational Expert Evidence in Disability Determinations & Decisions (Jan. 6, 2025) ("SSR 24-3p"). The new guidance explains that "the DOT is not the only reliable source of occupational information" and that "requiring our adjudicators, VSs, and VEs to identify and explain conflicts with the DOT is time consuming . . . [and] led to unnecessary remands to resolve apparent conflicts that were not identified at the hearing when the VE testified . . . . We are rescinding SSR 00-4p and will no longer require our adjudicators to identify and resolve conflicts between occupational information provided by VSs and VEs and information in the DOT." SSR 24-3p. The Court will nevertheless consider the claims raised under SSR 00-4p, since it was in effect at the time of the decision in this case. SSR 24-3p n.1 ("We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions.").

Pearson, 810 F.3d at 207-09. In Pearson, the Fourth Circuit thus clarified the steps an ALJ must take to identify and resolve apparent conflicts between a vocational expert's testimony and the DOT. Specifically, the Fourth Circuit held that, if an expert's testimony apparently conflicts with the DOT, the expert's testimony can only provide substantial evidence to support the ALJ's decision if the ALJ received an explanation from the expert explaining the conflict and determined both (1) that the explanation was reasonable and (2) that it provided a basis for relying on the expert's testimony rather than the DOT. Pearson, 810 F.3d at 209-10; see also Rholetter v. Colvin, 639 F. App'x 935, 938 (4th Cir. 2016).

Here, Plaintiff contends that the vocational testimony on which the ALJ relied at step five of the sequential analysis conflicted with the DOT as to all of the identified jobs. Specifically, the ALJ identified three representative jobs available in the national economy that Plaintiff could perform:

- Nut Sorter (DOT 521.687-086, 1991 WL 674226),
- Table Worker (DOT 739.687-182, 1991 WL 680217), and
- Stuffer (DOT 731.685-014, 1991 WL 679811).

(Tr. at 38.) Plaintiff now argues that these manufacturing jobs, as described by the DOT, all involve machinery and, as such, apparently conflict with the ALJ's finding that Plaintiff "must avoid working . . . around dangerous machinery." (Tr. at 31.) However, as discussed below, there is no apparent conflict that required explanation, and the Fourth Circuit in Pearson rejected the contention that the ALJ must identify and address every possible conflict. Pearson, 810 F.3d at 209.

Here, the DOT describes the job tasks for the position of Nut Sorter as follows:

16

> Removes defective nuts and foreign matter from bulk nut meat: Observes nut meats on conveyor belt, and picks out broken, shriveled, or wormy nuts and foreign matter, such as leaves and rocks. Places defective nuts and foreign matter into containers.

DOT 521.687-086, 1991 WL 674226. Similarly, the position of Table Worker involves "[e]xamin[ing] square (tiles) of felt-based linoleum material passing along on conveyor and replac[ing] missing and substandard tiles." DOT 739.687-182, 1991 WL 680217. Finally, the job of Stuffer involves the following tasks:

> Tends machine that blows filler into stuffed-toy shells: Inserts precut supporting wire into shell. Places shell opening over stuffing machine nozzle. Depresses pedal to blow cotton or chopped foam rubber filler into shell to impart shape to toy. Places stuffed toy in tote box. Records production. May stuff toys by hand.

DOT 731.685-014, 1991 WL 679811. Plaintiff contends that the conveyor belts involved in the jobs of Nut Sorter and Table Worker and the stuffing machine used by Stuffers could potentially constitute "dangerous machinery." Because neither the vocational expert nor the ALJ acknowledged or addressed this potential conflict, Plaintiff argues that his claim merits remand under Pearson.

However, the DOT's job descriptions consist of more than the brief paragraphs set out above and relied upon by Plaintiff. The Selected Characteristics of Occupations ("SCO"), a companion publication included in the DOT, provides detailed physical and environmental demands for each job. Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, Appendix C, D (U.S. Dep't of Labor 1993). The SCO further describes the frequency a particular job involves the activity in question. For example, a job may require tasks such as crouching, far acuity, or exposure to extreme cold 1/3 to 2/3 of the time, more than 2/3 of the time, or not at all. Crucially, one of the many demands

17

included in the SCO is the extent to which a job exposes the worker to hazards. The hazards defined in the SCO . . . include: moving mechanical parts of equipment, tools, or machinery; electrical shock; working in high, exposed places; exposure to radiation; working with explosives; and exposure to toxic, caustic chemicals. Social Security Ruling 96-9p, Policy Interpretation Ruling Titles II And XVI: Determining Capability To Do Other Work—Implications Of A Residual Function Capacity For Less Than A Full Range Of Sedentary Work, 1996 WL 374185, at *8-9 (July 2, 1996) ("SSR 96-9p"). Specifically as to hazards involving moving mechanical parts of equipment, the SCO describes the extent of "[e]xposure to possible bodily injury from moving mechanical parts of equipment, tools, or machinery." Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, Appendix D (U.S. Dep't of Labor 1993).

Although Plaintiff contends that there appears to be a conflict between the RFC limitations that limit his exposure to dangerous machinery and the DOT descriptions of the jobs identified at step five, the DOT descriptions for all three positions provide that they do not involve any exposure to moving mechanical parts of equipment, tools, or machinery; or electric shock; or high, exposed places; or radiation; or explosives; or toxic caustic chemicals. The DOT descriptions for each position specifically provide that these conditions are "Not Present – Activity or condition does not exist." See DOT 521.687-086, 1991 WL 674226; DOT 739.687-182, 1991 WL 680217; DOT 731.685-014, 1991 WL 679811. In these circumstances, there is no apparent conflict between the VE's testimony and the DOT positions relied on by the ALJ. Indeed, as Defendant correctly notes, this Court, along with other courts within the Fourth Circuit—and across the nation—have found no conflict,

18

apparent or otherwise in similar cases. See James B. v. O'Malley, No. 1:22CV1103, 2024 WL 920722, at *6 (M.D.N.C. Mar. 4, 2024) (citing Carter v. Kijakazi, No. 3:20-cv-00672, 2021 WL 4931724, at *6 (S.D.W. Va. Sept. 30, 2021)); Stover v. Berryhill, No. 5:19-cv-00062, 2019 WL 2895023, at *10 (S.D.W. Va. June 6, 2019); Maxwell v. Saul, No. 1:18-cv-00894-GSA, 2019 WL 3546837, at *5 (E.D. Cal. Aug. 5, 2019); White v. Colvin, No. 3:16-cv-0322, 2018 WL 6537150, at *4 n.4 (M.D. Pa. Nov. 21, 2018); Spears v. Berryhill, No. 16-2333-JPR, 2018 WL 707989, at *9-10 (C.D. Cal. Feb. 5, 2018); Hensley v. Colvin, No. 15-66-GFVT, 2016 WL 3964336, at *6 (E.D. Ky. July 21, 2016); Wigmore v. Colvin, No. 6:12-cv-0611-ST, 2013 WL 1900621, at *18 (D. Or. Apr. 16, 2013); Amanda L.S. v. Kijakazi, No. 21C5775, 2023 WL 2711663, at *7-8 (N.D. Ill. Mar. 30, 2023) (collecting cases)); see also Phipps v. Comm'r of Soc. Sec., No. 5:22-CV-00085-DSC, 2023 WL 105331, at *4 (W.D.N.C. Jan. 4, 2023) (finding no apparent conflict between an RFC limitation precluding exposure to "dangerous machinery" and positions involving a dumbwaiter or conveyer belt where the SCO notes no involvement of hazards); Palmer v. Berryhill, No. 5:18-CV-01488, 2019 WL 2387055, at *4-5 (S.D.W. Va. May 8, 2019) (finding no apparent conflict between RFC limitation precluding more than frequent exposure to "dangerous machinery" because the DOT SCO "specifically provides that moving mechanical parts, electric shock and other environmental hazards are not present").

Given the overwhelming balance of the case law, the Court concludes that no unresolved apparent conflict exists in the present case, and the ALJ was entitled to rely on the

expert's testimony at step five of the sequential analysis regarding the representative occupations of Nut Sorter, Table Worker, and Stuffer.[9]

IT IS THEREFORE ORDERED that the Commissioner's decision finding no disability is AFFIRMED, that Plaintiff's Dispositive Brief [Doc. #8] is DENIED, that Defendant's Dispositive Brief [Doc. #12] is GRANTED, and that this action is DISMISSED with prejudice.

This, the 27th day of March, 2025.

/s/ Joi Elizabeth Peake
Joi Elizabeth Peake
United States Magistrate Judge

---

[9] The Court also notes that even if there were an apparent conflict with the positions of Nut Sorter and Table Worker based on the presence of a conveyer belt, no such conflict exists with respect to the position of Stuffer, so the alleged failure is harmless in any event.